**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-CR-288 (BAH)** |
| **JOSEPH PASTUCCI,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Joseph Martin Pastucci to 30 months of incarceration, three years of supervised release, restitution in the amount of $2,000, and a special assessment of $100. A sentence at the high point of his calculated guidelines range of 24 to 30 months reflects the seriousness of his offense while also recognizing his acceptance of responsibility and quick resolution of his case.

## I.  INTRODUCTION

The defendant, Joseph Martin Pastucci, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States

Pastucci, a handyman and machinery repair technician from New Cumberland, Pennsylvania, attended a "Stop the Steal" rally in Washington, D.C. on December 12, 2020, with his former romantic partner and codefendant, Jeanette Mangia.[2] Throughout December 2020, Pastucci and Mangia made plans to return to Washington, D.C. on January 6. They anticipated violence, exchanged messages about possible chemical irritants to bring with them, and discussed the procedure for certifying the results of the 2020 presidential election. On the morning of January 6, they traveled to Washington, D.C. and attended the former President's rally. From there, they went to the Capitol, climbed up the Northwest Steps, and entered the Capitol through the Senate Wing Door two minutes after the first breach of the building. Inside, Pastucci took a wide-ranging path that, over the course of approximately fifty minutes, brought him and Mangia to, among many other places, the Rotunda, the Speaker of the House's office suite, the personal office of the Speaker of the House, and the floor of the United States Senate. While in the Senate, Pastucci watched as Mangia flipped through documents that were left behind on Senators' desks. After being removed from the Senate, Pastucci refused to leave the building and had to be physically pushed out of the building by a police officer. After Mangia was also forcibly removed from the building, Pastucci assaulted one of the officers who carried her out of the building by shoving him

---

Capitol building and grounds and certain costs borne by the United States Capitol Police ("USCP"). The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

[2] As of this filing, Mangia's case is still pending. *See* Status Report, September 23, 2024.

in the chest. Approximately fifteen minutes later, Pastucci re-entered the building through the East Rotunda Door and forced his way through the crowd there back into the Rotunda. After feeling the effects of chemical irritants in the air, Pastucci left the Capitol through the Memorial Door. Between his two entrances into the building, Pastucci spent more than an hour inside the Capitol.

The government recommends the Court sentence Pastucci to 30 months of incarceration, which reflects both the gravity of his conduct and acknowledges his early admission of guilt.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021, Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 115, for a short summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.    Pastucci's Role in the January 6, 2021 Attack on the Capitol

#### *Pre-January 6 Planning and Earlier Activities on January 6*

Following the presidential election in November 2020, Pastucci made efforts to both educate himself on the proceedings that were going to happen on January 6 and to prepare for violence that might occur in Washington, D.C. On December 6, 2020, Pastucci shared with Mangia purchase information about various chemical irritants, including pepper spray, red pepper gel, and bear spray. Six days later, on December 12, 2020, Pastucci and Mangia attended a "Stop the Steal" rally in Washington, D.C.

On December 15, 2020, Pastucci sent Mangia a text message that had been forwarded to

him. This text message outlined the certification process that would be taking place in the Capitol on January 6, the Electoral College certificates that would be sent to Congress to be counted, and the role of Vice President Pence in the proceedings:

> Today, the electoral college votes will be sealed and sent by special carrier to Washington where they remain sealed until January 6th when the House and Senate will come into a joint session to open the votes. The media going to make you believe that it's all over and Joe Biden will official president (*sic*)…

> On January 6th, Nancy Pelosi will sit down with the rest of the House members as she has no special power or authority over the hearing… Vice President Mike Pence will have all the authority as president of the Senate for that day and will accept or reject motions to decide the next steps by the assembly.

> Remember…Mike Pence is in full authority that day as written in the Constitution. The ballots will be certified today but that means nothing…

> The votes will be opened and at that point one House member could, and most likely will, raise their hand to object to the Vice President on the state of elector's votes. That objection could cover fraud or any other reason, and with the second of that objection everything changes.

> Everything!!

> The House and Senate will divide for two hours (at least) to debate, then vote. The vote be per Senator with the Vice President being the deciding vote if needed in the Senate, while the vote in the House will only be ONE vote per delegation, per state, not per House member!!! The Republicans have 30 delegation votes. If this scenario runs true, President Trump gets re-elected.

> The Democrats, the media, social networks and globalists around the world will come unhinged and chaos will erupt. Bigly President Trump is trying to do the right thing and go through the courts first, expose all the fraud, but we all know that none of the courts, even the Supreme Court wanted to touch this issues with a 10-ft pole! This is why our forefathers were so brilliant because they knew something like this could happen someday. So, don't list to the media and all their deception and lies. All you have to do is read the Constitution and you know that the law, policies and procedures are on our side.

> Tic Toc… Tic Toc…

4

ECF 115 at ¶ 10.

With the knowledge that the certification was taking place on January 6 and that the Electoral College certificates would be in the Capitol and counted by the Vice President, Pastucci and Mangia made plans to return to D.C. and prepared for violence. On December 20, 2020, Mangia sent Pastucci an Amazon.com link for a "flamethrower." Pastucci advised her, "That's cool but u wouldn't get away with carrying it[.]" Mangia responded, "Don't worry about me."

As part of their plans to join the "Stop the Steal" rally in Washington on January 6, Pastucci and Mangia planned to carry a sign. On January 2, 2021, Mangia sent Pastucci possible sign slogans, including:



ECF 115 at ¶ 12.

Three days later, on January 5, 2021, Pastucci and Mangia discussed a rumor that airports would be closing in the Washington, D.C., area. As part of this conversation, they discussed that some people going to the rally planned to bring guns with them:

Mangia: They are trying to close the airports 🙁

>Pastucci: That could be a prob for some patriots to get to DC
>Mangia: Oh (*sic*) course
>Pastucci: Hopefully, they don't close
>Mangia: Heading home
>Pastucci: OK see u soon
>Mangia: Everybody is bringing their gun sounds like it 😟
>Pastucci: Is that definite or not sure
>Mangia: The group that is going with Rattlesnake are bringing their guns.
>They are hiding them in there (*sic*) vehicles for the ride to Virginia

ECF 115 at ¶ 13.

Early in the morning of January 6, Pastucci and Mangia drove to D.C. in Mangia's car. Pastucci carried an American flag with the text of what appears to be the Second Amendment to the Constitution printed on it. Pastucci and Mangia attended the "Stop the Steal" rally. For at least some portion of the rally,

### Pastucci's Approach to the Capitol

Pastucci approached the Capitol from the west via Pennsylvania Avenue. *See* Figure 1. While he was on Pennsylvania Avenue, Pastucci carried the sign that he and Mangia had discussed in text messages earlier in the week. The sign read: "FUCK BLM & ANTIFA STOP THE STEAL NOW! YOU TYRANT BASTARDS!!!" *Id.* The sign also included a middle-finger emoji and a yellow section at the bottom that read "WARNING: DON'T BE AN ASSHOLE." *Id.*



*Figure 1 (Gov. Ex. 4).*[3]

As Pastucci was making his approach to the West Front of the Capitol, a series of events happened there in rapid succession. Rioters breached the secure perimeter around the Capitol by pushing past and through police officers at the Peace Circle at 12:55 p.m. Between 12:55 p.m. and 1:15 p.m., USCP officers, with the assistance of newly arrived MPD officers, worked to re-establish a defensive line in the West Plaza of the Capitol complex. For approximately thirty minutes, this police line held even as officers were assaulted by members of the mob, which was growing increasingly violent. At 1:48 p.m., a group of rioters pushed through the small group of USCP officers who were standing at the base of the Northwest Stairs, around which a scaffolding structure had been constructed to hold up the grandstands for the upcoming inauguration. The mob quickly moved into the scaffolding. At 2:08 p.m., a group of rioters charged against the group of

---

[3] Pastucci is indicated in red throughout.

7

police holding them at bay on a landing of the Northwest Stairs. At 2:13 p.m., rioters smashed

through the windows at the Senate Wing Door and breached the Capitol. Pastucci's

**Pastucci's Breach of the Capitol and Expansive Route Through the Building**

Less than two minutes after this first breach of the building, Pastucci entered the building

through the Senate Wing Door holding his American flag. *See* Figure 2.



*Figure 2 (Gov. Ex. 5.1 at 1:00).*

Over the next fifty-three minutes, Pastucci took a wide-ranging path through the Capitol

Building. First among these many places was a hallway on the House side of the Capitol where,

starting at approximately 2:26 p.m., Pastucci was at the head of a group of rioters who confronted

police officers who were blocking the way further into the Capitol. *See* Figure 3; *see also* Gov. Ex.

6 at 08:29-11:23



*Figure 3 (Gov. Ex. 6 at 8:40).*

When this confrontation started, Pastucci held up his flag across his chest in a defensive posture as an officer from the Capitol Police approached him. *Id.* at 8:33-8:36. Pastucci then screamed at a Capitol Police officer inches from the officer's face, and pointed his finger repeatedly at the officer, coming within inches of jabbing the officer in the face. *Id.* at 8:42-09:20. Even when he backed away from directly confronting the officers, Pastucci remained towards the head of the crowd and continued to try to get the officers to let him pass. When this effort failed, Pastucci turned around and went back the way he came.

After turning around, Pastucci made his way through the first floor of the Capitol before taking a staircase up to the Speaker of the House's office suite on the second floor. Between 2:34 p.m. and 2:36 p.m., Pastucci entered the Speaker's office suite before entering the Speaker's personal office. Inside of the Speaker's office suite, Pastucci saw clear signs that rioters were ransacking the office, including a smashed mirror, scattered papers, rioters tossing personal and government property around the office, and rioters encouraging the theft of the Speaker's personal property. *See* Gov. Ex. 7 at 08:38-09:24. Rather than turning around to leave or instructing other

9

rioters not to destroy the office of the third person in line for presidency, Pastucci took a photo of Mangia as she posed in front of a fireplace, while scenes of the riot played out on live television mere feet to his left. *See* Figure 4; *see also* Gov. Ex. 7 at 09:33-END.



*Figure 4 (Gov. Ex. 7 at 09:33).*

After leaving the Speaker's personal office, Pastucci set his sights on the objective that had brought him to the Capitol: interfering with the certification of the Electoral College results. Over the next approximately twelve minutes, Pastucci walked through the Rotunda, up the East Stairs to the third floor, right up to the threshold of the Senate Gallery, back down the Senate Stairs to the second floor, and then—after wandering for several minutes—was face-to-face with a door bearing the seal of the United States Senate. At 2:46 p.m.,[4] Pastucci watched as Mangia rapped on the door of the chamber. See Figure 5.

---

[4] Vice President Pence had been evacuated through this same door twenty-one minutes earlier.



*Figure 5 (Gov. Ex. 8).*

The locked door did not deter Pastucci in his efforts to enter the Senate and gain access to the Electoral College certificates. He went back the way he came and found that rioters who breached the Senate Chamber through the gallery had opened a door to allow other rioters to enter the Chamber. At 2:48 p.m., Pastucci crossed the threshold into the United States Senate Chamber. Within one minute of entering the Senate Chamber, Pastucci walked into the middle of the chamber and mounted the Senate dais. *See* Figure 6; *see also* Gov. Ex. 9.1 at 16:00-16:30.



*Figure 6. (Gov. Ex. 9.1 at 16:41.)*

Pastucci took photographs of Mangia as she posed on the dais. After dismounting the dais, Pastucci watched as other rioters rifled through Senators' desks and inspected the paperwork that the lawmakers left behind when they were evacuated. Pastucci then moved with Mangia to a desk immediately in front of the dais and, standing less than a foot away from Mangia, watched as she picked up a stack of papers from the desk of a Senator and began to flip through it. *See* Figures 7-8; *see also* Gov. Ex. 9.1 at 18:25-19:05 and Gov. Ex 9.2 at 0:00-0:03.



*Figure 7 (Gov. Ex. 9.1 at 18:33).*



*Figure 9 (Gov. Ex. 9.2 at 0:00)*

After inspecting these documents inside of the Senate, Pastucci and Mangia continued to mill about the chamber before taking a seat in the back row near the door that they had used to walk on to the Senate Floor. *See* Figure 9. While seated in the back row of the Senate, Pastucci greeted and hugged other rioters. *See* Gov. Ex. 9.1 at 26:32-28:22.



*Figure 9 (Gov. Ex. 9.1 at 26:56).*

Police officers began clearing the Senate starting at approximately 3:00 p.m., and Pastucci exited through the door he had entered at just after 3:01 p.m.

**Pastucci's Resistance Against and Assault on Police Officers**

At 3:04 p.m., officers near the near the Senate Carriage Door ordered Pastucci to leave the building but he refused. When an officer from the Metropolitan Police Department attempted to physically push Pastucci out of the building, Pastucci resisted the officers' efforts. *See* Gov. Ex 10 at 04:45-04:57. As part of his resistance, Pastucci continued to try to get around and past the officer, including by grabbing a wooden piece of furniture near a metal detector and using it to gain leverage over the officer. *Id.*; *see also* Figures 10a & 10b.

13

 

*Figure 10a (Gov. Ex. 10 at 04:47).*    *Figure 10b (Gov. Ex. 10 at 04:55).*

Pastucci was removed from the Capitol through the Senate Carriage Door. Outside of the door, he watched as Mangia also refused to leave the building of her own accord, and had to be physically carried out by police officers while she kicked and flailed at them. Once a group of police officers in riot gear carried Mangia out of the Carriage Door, Pastucci retaliated against the officers by shoving one of the officers in his chest and shoulder area, pushing the officer backward. *See* Figure 11; *see also* Gov. Ex. 11 at 05:08-06:00.



*Figure 11 (Gov. Ex. 11 at 05:56).*

14

### *Pastucci's Second Breach of the Capitol*

Shortly after being ejected from the Capitol at approximately 3:06 p.m., Pastucci entered the building a second time. This time, Pastucci entered the building via the East Rotunda Door with a large crowd that was flowing into the building through the breached doors there. Pastucci crossed the threshold of the Capitol for the second time at approximately 3:21 p.m. *See* Gov. Ex. 12 at 01:01-01:15. When he entered the foyer between the East Rotunda Door and the Rotunda, police officers in that area were working to stem the flood of rioters who were pouring into the Rotunda. Despite the dense crowd of rioters and the officers' efforts to prevent additional rioters from entering the Rotunda, Pastucci was able to do so: over the course of approximately two minutes, Pastucci maneuvered his way to the front of the crowd of rioters, who pushed against the officers until they entered the Rotunda. Just as Pastucci reached the front, the line of officers gave way and Pastucci was one of the last two people to enter the Rotunda before officers were able to close the door and stop the flow of rioters. *See* Figures 12a-c; *see also* Gov. Ex. 13 at 0:00-02:50.



*Figure 12a (Gov. Ex. 13 at 0:09)*



*Figure 12b (Gov. Ex. 13 at 02:20).*



*Figure 12c (Gov. Ex. 13 at 02:53).*

Back inside the Rotunda, Pastucci quickly began to feel the effects of the chemical irritants that had been used to clear the rioters in that area. After a short period of time in a bottleneck near the entrance to the Rotunda, Pastucci informed a police officer inside of the Rotunda that he and Mangia wanted to leave. They were instructed to wait a short period before walking across the Rotunda towards the Memorial Door. They exited the Capitol through the Memorial Door at

16

approximately 3:27 p.m.

### *Pastucci's Post-Arrest Statements*

Pastucci was arrested on April 26, 2023. Following his arrest, he gave a Mirandized statement to the FBI. In this statement, Pastucci stated that he learned about the "Stop the Steal" event happening in Washington, D.C., on January 6, 2021, "a couple months" before the rally and heard about it via the internet. Pastucci stated that he did not intend to go to the Capitol but went to the Capitol after the crowd started moving that way after the rally. Pastucci claimed that he "got stuck in the crowd and wound up getting pushed" into the building. He described his predicament at the Capitol as being "between a rock and a hard place." Pastucci also stated that he tried to get out of the crowd before going to the Capitol but was unable to do so because people were pushing him towards the building. Pastucci said that he realized that "this wasn't a good idea" when he got past the steps, but he did not identify which specific steps he was talking about. Pastucci denied seeing any violence as he approached the building and further denied seeing any property being damaged. Pastucci claimed that he only walked through the door because he was "let in" and he observed that things had "calmed down a bit." Pastucci claimed that as soon as he walked through the Senate Wing Door, he was trying to find a way out of the building but became lost and was "asking where the hell do you go" to get out. About his entrance into the Speaker's Office, Pastucci said that he did not know whose office it was and did not recall taking pictures of Mangia in the Speaker's Office. Pastucci added, though, that he knew that "he probably should not have been there" but that he did not "break" or "harm" anything. Regarding his entrance on to the Senate Floor, Pastucci claimed that he was "taking a tour" and did not think he was breaking any laws.

About his confrontation with police officers near the Senate Carriage Door, Pastucci claimed that he had been trying to leave the building and that the officers "threw [him] out for no reason." Pastucci claimed that when he resisted being thrown out, he was trying to get back to Mangia who—according to him—was already lying on the floor. Pastucci then denied remembering shoving the officer outside the Senate Carriage Door.

Pastucci denied remembering entering the Capitol a second time. When the interviewing agent told him details about his entrance through the East Rotunda Door and pushing his way into the Rotunda, Pastucci still denied having any memory of going into the building a second time.

When he was asked if he was worried that the FBI was going to arrest him for his conduct at the Capitol, Pastucci stated that he was not worried about it "simply because in [his] eyes [he] really didn't do anything wrong; we didn't break anything, didn't cause any bodily harm to anybody, didn't shoot anybody, didn't stab anybody—didn't do any of that stuff—[he] just thought they were going through a peaceful walk through the House." He concluded, "personally I didn't do anything wrong—I mean, I know on the website it says it's open to the public."

### III.    THE CHARGES AND PLEA

On August 23, 2023, a federal grand jury returned an indictment charging Pastucci with eleven counts: (1) in count one, obstruction of an official proceeding and aiding and abetting, in violation of 18 U.S.C. §§ 1512(c)(2), 2; (2) in count two, civil disorder and aiding and abetting, in violation of 18 U.S.C. § 231(a)(3); (3) in count three, assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a)(1); (4) in count four, entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1); (5) in count five, engaging

in disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2); (6) in count six, engaging in physical violence in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(4); (7) in count seven, entering and remaining on the floor of congress in violation of 40 U.S.C. § 5104(e)(2)(A); (8) in count eight, entering or remaining in certain rooms of the Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(C); (9) in count nine, committing disorderly conduct in a Capitol building, in violation of 40 U.S.C. § 5103(e)(2)(D); (10) in count ten, committing acts of physical violence in the Capitol grounds or buildings; and (11) in count eleven, parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G). On April 26, 2024, Pastucci was found guilty of all counts on the indictment in a stipulated bench trial.[5] On September 30, 2024, the government moved to vacate the results of the stipulated bench trial and Pastucci pled guilty to Count Three of the indictment, assaulting, resisting, or impeding certain officers in violation of 18 U.S.C. § 111(a)(1). As part of the plea agreement, the government agreed to dismiss the remaining counts of conviction.

## IV.   STATUTORY PENALTIES

Pastucci now faces sentencing on Count Three of the indictment. The statutory maximum for a violation of 18 U.S.C. § 111(a)(1), Assaulting, Resisting, or Impeding Certain Officers, is up

---

[5] On June 28, 2024, the Supreme Court decided *Fischer v. United States*, 603 U.S. 480 (2024). In *Fischer*, the Supreme Court held that Section 1512(c) does not cover "*all* means of obstructing, influencing, or impeding any official proceeding." *Id.* at 490. However, the Court did not reject the application of § 1512(c)(2) to all January 6 prosecutions. Rather, the Court explained that the government must establish that the defendant impaired the availability or integrity for use in an official proceeding of records, documents, objects, or other things used in the proceeding – such as witness testimony or intangible information – or attempted to do so. *Id.* at 491. Following *Fischer*, Pastucci elected to proceed with a plea resolution to this case rather than pursuing an appeal of his conviction for Count One.

to eight years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The government agrees with the Guidelines calculation set forth in the presentence report, which is the same as that agreed to by the parties in the plea agreement:

**Count Three: 18 USC § 111(a)(1), Assaulting, Resisting or Impeding Certain Officers**

| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) |
|---|---|---|
| Adjustment | +6 | U.S.S.G. § 3A1.2(a), (b) |
| **Total** | **20** | |

The U.S. Probation Office calculated Pastucci's criminal history as category I, which is not disputed. PSR ¶ 70. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 17, Pastucci's Guidelines imprisonment range is 24 to 30 months' imprisonment. Pastucci's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a 30-month term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Pastucci's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of presidential power, and throwing the United

States into a constitutional crisis. Prior to January 6, 2021, Pastucci made plans for potential violence and discussed weapons with his codefendant. After attending the then-president's rally, Pastucci was among the first rioters to enter the Capitol and among the last rioters to leave. On January 6, he was determined to accomplish his ends of stopping the certification of the Electoral College results for the 2020 presidential election. In furtherance of that goal, he took a wide-ranging path through the building that brought him into the personal office of the Speaker of the House and onto the Senate Floor, where he personally inspected documents taken from the desks of Senators. After being forcibly ejected from the building, he assaulted an officer in retaliation, and then re-entered the building fifteen minutes later. The nature and circumstances of Pastucci's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 30 months of incarceration.

### B.  The History and Characteristics of the Defendant

Pastucci is a fifty-year-old man who has worked a series of handyman, repair, and retail positions throughout his life. He has several criminal convictions. In 1996, he was convicted of burglary for entering a dwelling in Gettysburg, Pennsylvania, and stealing various compact discs, video games, a video game console, and a boom box. PSR ¶ 67. For this offense, he was sentenced to no less than six months but not more than 23 months incarceration, of which he served seventeen months before being released on parole. *Id.* In 2002, he was sentenced to one year imprisonment in connection with a speeding offense in Frederick, Maryland. PSR ¶ 68. On Christmas Eve 2009 he was charged with assault, which resulted in him being convicted in 2010 of harassing, striking, shoving, or kicking a person or attempting to do the same. PSR ¶ 69. During the pendency of this

case, he was arrested on sexual assault charges in Fairview Township, Pennsylvania, and is presently charged with multiple felony charges including rape by forcible compulsion, aggravated indecent assault, sexual assault, stalking, and false imprisonment. PSR ¶ 76; *see also* ECF 14 (filed under seal). Pastucci's crimes on January 6 were part of a continuing pattern wherein he has repeatedly flouted the law and resorted to force and violence to get what he wants.

Moreover, Pastucci repeatedly lied to the FBI and tried to minimize his conduct when he was arrested in this case. Chief among these lies, half-truths, and mischaracterizations is Pastucci's persistent claim that he was pushed toward the Capitol, forced to enter the Capitol Building, and had no chance to leave. Pastucci told this bald-faced lie despite the interviewing agent advising him that he had watched the surveillance from the Capitol and knew Pastucci's route through the building. Pastucci's approach to the Capitol riot and his ascent up to the Senate Wing Door through Upper West Terrace took him through the scene of an active, violent riot and past the location where officers were battling rioters for control of the West Plaza. Pastucci entered the building of his own accord and was not pushed or crammed into the building by the crowd behind him. Moreover, Pastucci spent more than fifty minutes in the building during his first breach of the building and was not, by any stretch of the imagination, looking for an exit the whole time. Pastucci spent fifteen minutes inside the Senate Chamber and during that time took pictures of Mangia on the dais, inspected documents taken from the desks of Senators, and then sat for several minutes in the seat of a United States Senator. This is hardly the behavior of someone who was "trying to leave." This lie becomes particularly outrageous given that, after he was forcibly ejected from the building, Pastucci re-entered it fifteen minutes later and pushed his way through a crowd to gain

access to the Rotunda. This behavior is the opposite of someone who was trying to leave from the moment he entered the building.

The myriad lies that he told during his custodial interview with the FBI and his substantial contacts with the criminal justice system demonstrate that Pastucci's conduct was not an isolated incident in an otherwise upstanding life. Pastucci's history and characteristics strongly support a 30-month sentence of incarceration.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Pastucci's criminal conduct on January 6 was the epitome of disrespect for the law. "We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power." *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20. With its sentence, the Court should communicate both that offenses like Pastucci's on January 6 are of the utmost seriousness and that this Court will not tolerate Pastucci or any other person's willingness to violate the law to undermine one of the core principles of our Republic will not be tolerated.

### D. The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving

domestic terrorism, which the breach of the Capitol certainly was.[6] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

First, although Pastucci has a criminal history category of I, his history of arrest and conviction shows a clear pattern of assaultive behavior and disregard for the law. *See* Section VI(B) *supra.* Second, although Pastucci has accepted responsibility for his actions, his statements before January 6 and immediately after his arrest in April 2023 show that he was both preparing for violence and seeking to evade his responsibility for his conduct. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

Pastucci's conduct on January 6 shows that he is someone who is dearly in need of specific deterrence. Pastucci had ample opportunities to turn away from the scene of the riot unfolding around him but repeatedly chose not to. His first such opportunity was when police blocked his

---

[6] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

way in the hallway at 2:26 p.m. Rather than listening to these officers' instructions to leave, Pastucci screamed in their face before turning around to find another way. After leaving the Senate, Pastucci was forcibly removed from the building and then retaliated against a police officer who had to remove Mangia from the building. Still, Pastucci was undeterred and went back into the building fifteen minutes later. At every turn on January 6, Pastucci showed himself to be someone who is not easily deterred and who will continue on a course of action that he knows to be impermissible and unlawful if he believes that it will accomplish his ends. The Court should, therefore, sentence Pastucci to 30 months of incarceration so as to deter him from ever engaging in this conduct again.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

F.    **Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision

leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[7] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[8] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Joshua Hernandez*, 22-cr-42 (CRC), the defendant was, like Pastucci, one of the first rioters to breach the Capitol, although Hernandez climbed through the broken windows to the side of the Senate Wing Door rather than passing through the door itself. Like Pastucci, Hernandez made his way to the Speaker's Office, but Pastucci also entered the Speaker's personal office and took photographs of his codefendant posing in a chair there. Hernandez and Pastucci both entered the Senate Chamber, but Hernandez only entered the Senate Gallery while

---

[7] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[8] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Pastucci entered on to the floor of the Senate Chamber and remained there for approximately fifteen minutes. After making his way through the Rotunda, Hernandez was part of a coordinated push against officers near the Memorial Door. During this push, he assaulted an officer by striking him with a flagpole. Pastucci also assaulted an officer, and, unlike Hernandez, re-entered the building. Judge Cooper sentenced Hernandez to 22 months of incarceration.

In *United States v. David Arredondo*, 21-cr-373 (RCL), the defendant entered the Capitol through the East Rotunda Doors, as part of the first full breach of the doors at that location, like Pastucci. However, unlike Pastucci, Arredondo was an active participant in the breach of those doors. Like Pastucci, Arredondo assaulted an officer by shoving him, but Arredondo's assault was intended to help him breach the building while Pastucci's was done in retaliation for having been thrown out of the building. Arredondo was in the building for a significant period of time, but he was still in the building for less than half the time that Pastucci was. Like Pastucci, Arredondo went to one of the legislative chambers but, unlike Pastucci, did not enter on to the floor of the chamber. Unlike Pastucci, inside the building Arredondo was part of a group resistance against a police line. Also unlike Pastucci, Arredondo did not re-enter the building. Judge Lamberth sentenced Arredondo to 33 months of incarceration.

On balance, the severity of Pastucci's conduct was more similar to Arredondo's than Hernandez's. All three defendants engaged in active resistance against police officers and, in doing so, assaulted or resisted police officers who were trying to subdue the rioters and end the riot. Pastucci, unlike both Hernandez and Arredondo, went onto the Senate Floor and into the Speaker's personal office; he also re-entered the building after having been ejected once. Pastucci was in the

28

building longer than both Hernandez and Arredondo, and Pastucci's assault against police was a retaliatory strike, which is an aggravating factor not present in Hernandez's or Arredondo's cases. Arredondo, however, was an active participant in the breach of the East Rotunda Doors and ultimately was instrumental in those doors being opened to the flood of rioters. In light of the sentences impose in Arredondo's and Hernandez's cases, a sentence of 30 months' incarceration is appropriate here.

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[9] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

---

[9] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Pastucci must pay $2,000 in restitution, which reflects in part the role he played in the riot on January 6.[10]  Plea Agreement ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* Pastucci's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 134.

## VIII.  FINE

Pastucci's conviction for violating 18 U.S.C. § 111(a)(1) subjects him to a maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, Pastucci's financial assets set forth in the PSR suggest that he is unable, and is unlikely to become able, to pay a fine. PSR ¶¶ 104-114.

## IX.  CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a

---

[10] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

sentence of 30 months of incarceration, three years of supervised release, $2,000 in restitution, and

a $100 special assessment.

                              Respectfully submitted,

                              MATTHEW M. GRAVES
                              UNITED STATES ATTORNEY
                              D.C. Bar No. 481052

                    By:      *s/ Sean P. McCauley*
                             SEAN P. McCAULEY
                             Assistant United States Attorney
                             New York Bar No. 5600523
                             United States Attorney's Office
                             For the District of Columbia
                             601 D Street, NW
                             Washington, DC 20530
                             Sean.McCauley@usdoj.gov

                             SEAN J. BRENNAN
                             Assistant United States Attorney
                             NY Bar No. 5954128
                             601 D Street NW
                             Washington, DC 20530
                             Sean.Brennan@usdoj.gov
                             (202)252-7125